S. L. JOHNSON v. STATE.

[65 South. 218.]

1. CRIMINAL LAW. *Evidence. Confession. Voluntary. Admissibility. Preliminary evidence. Threats.*

A voluntary confession is one proceeding from the spontaneous operation of the party's own mind, free from the influence of any extraneous disturbing cause. A confession was not voluntary which was obtained from a defendant who was sick and in jail and in fear of lynching by a newspaper reporter who told the defendant he would have no peace or hope of salvation unless he confessed, that he, the reporter, was a "Spiritualist"

and could look into the defendant's heart, and see the crime which he had committed.

2. CONFESSIONS. *Admissibility. Sufficiency of preliminary evidence.*
  If on preliminary hearing by the court, there is a reasonable doubt as to whether a confession was freely and voluntarily made, it must be excluded from the jury, and after a confession has, ,on preliminary hearing by the court, been admitted to go to the jury, either party may introduce the same evidence as was submitted to the court, and any additional evidence relative to its weight or credibility, and if it then, or at any stage of the trial, appears that the confession was made under circumstances rendering it incompetent, it should be excluded. It is necessary to look to all the surroundings of the person making the confession in order to determine whether it is rendered inadmissible because it resulted from fear or threat or undue influence of a person, even though one not in authority, operating upon the mind of the person confessing. Even the act of third persons may amount to a threat excluding confession though no objectionable words are spoken.

APPEAL from the circuit court of Claiborne county.
HON. H. C. MOUNGER, Judge.
S. L. Johnson was convicted of murder and appeals. The facts are fully stated in the opinion of the court.

*C. A. French,* for appellant.

What purported to be a confession made by Johnson to Fitzgerald, should not have been admitted in evidence against the defendant, for two reasons, first, the confession was not shown to be absolutely free and voluntary, such as the law requires, and, second, for the reason that the *corpus delicti* was not clearly shown.

As to the first reason, I wish to say that there is no statute in this state regulating the admission of confessions, against one charged with crime, and therefore the admission of confessions depends entirely upon judicial annunciation of what the law is, as to what constitutes a confession, and when it is admissible.

A confession that may be used against a person who is charged with crime, and is on trial, as defined by Mc-

Kelvey on Evidence at page 111, sec. 75, is as follows, confessions are admissions of guilt made by persons accused of crime. Confessions to be admissible in evidence must be voluntary, if made as the result of threats or inducement they are inadmissible. McKelvey on Evidence, page 114, sec. 76. The important element in determining the admissibility of a confession, is that it should be voluntary. If it is voluntary within the definition of that term as laid down by the courts, it satisfies the only condition required.

The important quality of a confession is that it be spontaneous. The question then arises, did Johnson make a confession of guilt to Fitzgerald? If he did not, then the confession as detailed by the witnesses was clearly inadmissible. Fitzgerald told Johnson that he was a spiritualist, and that he could look down into his black heart and see the diabolic crime that he had committed, and that he, Johnson, was a liar. This was all done at the time when Johnson was sick, had fever, and was under the influence of medicines which had been administered by Dr. Hicks, and when Johnson was certainly in no fit condition to talk business of any kind, much less to make evidence that would be used against him, and might cost him his life, and as Fitzgerald said, that Johnson had spent a sleepless night, and was in a nervous condition, and was in jail and being hounded by all of the newspaper reporters in Vicksburg. Fitzgerald told Johnson, while in this condition, that he had better confess the crime and relieve his soul of the crime. Fitzgerald was then holding himself out as a spiritualist, and posing as Johnson's spiritual adviser. This was nothing less than a promise of reward that rendered the confession, if made, inadmissible.

This confession is testified to by Fitzgerald, was not that sort of a spontaneous, free and voluntary confession that the law recognizes as admissible in evidence against one charged with crime. This was not the sort

of a confession that comes from a clear and unclouded mind, that the law regards as sufficient to be used in evidence against the party making it. See note to sec. 80, page 118, McKelvey on Evidence.

The learned judge, who tried this case, should not have excluded the evidence of Dr. Acker, page 138-129, that evidence tended to show that a man sick with fever and taking quinine and other drugs usually administered by a doctor in malarial fevers, was not in a mental condition to make a clear statement of the fact that could be used in evidence against him as a confession. This evidence should have gone to the jury, or at least a part of it. This ruling of the court excluded from the consideration of the jury all evidence as to the mental condition of Johnson at the time he was supposed to have made the confession, and with the confession before the jury and no evidence whatever to rebut it, was very prejudicial to the defendant.

I respectfully submit that this was error in the learned trial judge. In McKelvey on Evidence, sec. 84, page 120, and in the note to that section it is held, that: "The question as to the mental condition of the accused at the time of making the confession is held to be for the jury to determine upon such evidence as both sides may submit."

The court in excluding the evidence of Dr. Acker from the consideration of the jury, left the jury nothing on which to base a finding against the condition of Johnson's mind that would render the confession either admissible or inadmissible.

I respectfully admit, that this was error in the trial court. The courts have shown the greatest liberality in the exclusion of declarations offered as confessions, particularly when made while in custody, or when under personal restraint, or where they have been obtained by questions assuming guilt, solicitations, promises or other inducements, threats or fraud; and the question of admis-

sibility of such declarations has, in many instances, turned upon the question whether they were made to one having official authority over the accused, or one sustaining toward him some confidential relation, such as his spiritual adviser, or one having control over or power to punish him. Encyclopedia of Evidence, Vol. 3, page 302, and authorities there cited.

The above authorities cover this case exactly, and show that the confession in this case was not such an one as should have been admitted. The confession, as detailed by Fitzgerald, that shows that it was not a free, voluntary and spontaneous confession of guilt, uninfluenced, by hope of reward, or fear of punishment as the law recognizes as admissible in evidence against the defendant, nor did it come from the defendant at a time when his mind was perfectly clear, and unclouded, but was made according to Fitzgerald's testimony, early in the morning while the defendant had fever, and had spent a sleepness night, and was in no condition to transact any sort of business, much less to make evidence against himself, which, if admitted by the court, might cost him his life. *State* v. *Smith,* 72 Miss. 42, 18 So. 482.

I respectfully call the court's attention to this case, for it strikes me that it is right in point, and especially so as the trial court excluded the confession, and the state appealed, and this court upheld the learned trial judge. The case of *United States* v. *Nutt,* 1 McLain, 499, 27 Fed. Case, No. 15900, and cited in note on page 303 Encyclopedia of Evidence, is also squarely in point, as are other material cases there cited.

The rule as laid down by the supreme court of this state seems to be the same as that stated in the text on page 303, Encyclopedia of Evidence, *supra,* and this court from the earliest decisions, seems to have required the strictest adherence to that rule, as is shown by the following cases: *William* v. *State,* 16 So. 296; *Harvey* v. *State,* 20 So. 837; *Ford* v. *State,* 21 So. 524; *Mitchell* v.

*State,* 24 So. 312; *Hamilton* v. *State,* 27 So. 606; *Bla-lock* v. *State,* 31 So. 105; *People* v. *Barrie,* 49 Cal. 324; *Spears* v. *State,* 2 Ohio St. 583.

From the rule as laid down in the foregoing cases which are respectfully cited, it appears that the confession as testified to by the state witnesses in this case against Johnson, was not that sort of a free, voluntary and spontaneous confession, uninfluenced by any outside influence as the law recognizes as a competent confession to be used against the party making it. I wish to call the court's attention to the following case, which, I think, is directly in point. *State* v. *Stallings,* 38 So. 261, 142 Ala. 112, I quote from the opinion of the court in that case, all confessions are *prima facie* not admissible as evidence, citing 1 Mayfield's Dig., page 206.

Again I desire to call the court's attention especially to the case of *Ammons* v. *State,* 32 So. 9, 80 Miss. 592, this case and the procedure of the Chief of Police Price, of Vicksburg, and his method of extorting a perfectly free and voluntary confession from the defendant, by the use of the sweat box, bears a very close affinity to the procedure of Mr. Fitzgerald, in his procedure in trying to extort the truth out of Johnson, by telling him, Johnson, that he, Fitzgerald, was a spiritualist, and that it would be better for him, Johnson, to tell the truth, and in Fitzgerald's opinion the truth meant that Johnson should confess the crime that Fitzgerald claimed had been committed, and which he, Fitzgerald, claimed to be able to look down into Johnson's black heart and see. Oh, man's inhumanity to man! *McAlister* v. *State,* 34 So. 156, 82 Miss. 459; *Peck* v. *State* (Ala.), 41 So. 759; *State* v. *Turner* (La.), 47 So. 680; *Banks* v. *State* (Miss.), 47 So. 437; *Dunham* v. *State,* 47 So. 545.

I respectfully submit that the confession as testified to by Fitzgerald was not so much a free, voluntary and spontaneous confession as the law requires, and was therefore not admissible, and the confession testified to

by the other witnesses, is controlled by the same law of evidence, for Johnson was prompted by whatever promise, or coercion as Fitzgerald had used to extort the confession, and therefore, no part of the confession should have been admitted.

*Ross Collins,* attorney-general, and *J. M. Vardaman,* associate counsel, for the state.

The error discussed by counsel in his brief is the admission, by the court, of the confession of appellant made to E. M. Fitzgerald and others the day after he was bound over to the grand jury by the justice of the peace. Counsel very earnestly contends that the confession of appellant was inadmissible, for the reason that appellant was unduly influenced by Fitzgerald and that his confession was induced by fear, improper influence, etc.

The record discloses that Fitzgerald went to see appellant twice on the day he was bound over to the grand jury and accused him of the crime, and told him that he, Fitzgerald, was a spiritualist and could look into his heart and tell that appellant had committed the crime with which he was charged. He appealed to him solely on religious grounds, urging that, if he was guilty of the crime as chagréd, it would be better for his conscience for him to confess. At no place in the record is there even a suggestion that Fitzgerald offered appellant any promise of aid, assistance, immunity or anything of the kind, nor did he threaten him in any way whatsoever. The confession was made the morning after Fitzgerald had talked to him, and after appellant had had a night to think the matter over and decide, in a calm manner, what he wanted to do. Granting, for the sake of argument, that Fitzgerald did use undue influence, the day of the trial, that would not render incompetent a confession made at the later date after the influence was removed. The next morning when Fitzgerald and Fox walked into the jail all that was said was: Fitzgerald:

"Johnson, I see you had another restless night" and I said, "are you ready to confess this morning?" and he said: "Yes, boys, I am ready to tell you all about it." Does that sound like anything but a free and voluntary confession? I submit that it does not.

This court had passed on the question as to whether confessions are admissible where obtained by appeals to reputation, justice, religious grounds, etc., and has held that such confessions are admissible in evidence against accused. *Frank* v. *State,* 39 Miss. 705, 2 Mor. St. Cas. 1474; *Lee* v. *State,* —— Miss. 114. See, also, in relation to the admissibility of confessions, *Cady* v. *State,* 44 Miss. 332; *Jones* v. *State,* 58 Miss. 349; *Simmons* v. *State,* 61 Miss. 243.

The latest learning of the books on the admissibilty of confessions in general is found in the note to the Ammons case wherein every phase of cases, relative to the admissibility of confessions, is treated in a thorough and exhaustive manner. See, especially, page 785, *et seq.*; *Ammons* v. *State,* 80 Miss. 592, 18 L. R. A. (N. S.), 768. A confession, otherwise competent, is not rendered incompetent by the fact that it was elicited by questions assuming the guilt of the prisoner. 12 Cyc. 468 (ix); *Sam* v. *State,* 33 Miss. 347. See, also, in this connection: 12 Cyc., pp. 465 (iii), 469, (iii), 477 (m); Wigmore on Evidence, 840; Wharton, Cr. Ev., 674, *et seq.*

REED, J., delivered the opinion of the court.

Appellant was convicted of murder, and sentenced to suffer capital punishment. The admission of a confession in the trial of the case is assigned as error.

Appellant and deceased were occupying together two house-boats in the Mississippi river at Vicksburg. The body of the deceased was found floating in the river with weights fastened to it. Because of its having remained for a time in the water, it was nearly unrecognizable. Bruised places on the head indicated that the deceased

had met his death by violence. Immediately appellant was arrested for the crime.

Mr. E. A. Fitzgerald, a leading citizen and newspaper man in the city of Vicksburg, obtained a confession from appellant. Mr. Fitzgerald's testimony shows that he was present at the coroner's inquest held that morning after the body was found. He took part in the examination before the coroner to the extent of indicating questions to be asked. After the inquest, he visited appellant in the jail. Late, in the evening, about seven p. m. of the same day, he went again to see appellant. The next morning he visited appellant the third time, and then secured the confession.

The purposes which Mr. Fitzgerald had in mind when he sought to obtain a confession from appellant will be shown by the following extracts from his testimony:

"Several murders had been committed around there on the canal, and I thought it was my duty as a citizen we ought to try to ferret it out. . . . I wanted to get his confession for the newspaper enterprise, and every now and then we fish somebody out of the canal that had been killed, and we never could convict anybody or get any trace of it, and I felt I owed it, as my duty, as a citizen of Mississippi and Warren county; I had nothing against Johnson. . . . I went there because I know when a man is sleepless he is at his worst point, and you can control him, and he is more ready to tell the truth and unburden himself and tell the truth; if you can get a criminal for a few nights, and you know they are restless and sleepless, you can go there and get the confession; otherwise, if I had wanted it as a newspaper article, I would have gone that afternoon, and it took me off my pins when he confessed so quick. . . . I thought he was guilty, and I think the hope of salvation is held out to the worst of sinners, and if he would confess, there was hope of saving his immortal soul; and I had a little newspaper enterprise in it I will admit; I have nothing

to conceal about it at all. I felt like he was guilty, and I have had some training in that line and was post-office inspector, and I have gotten confessions out of people before I met Johnson; he is not the only man I have gotten a confession out of."

Appellant was sick with fever during the time he was visited, and Mr. Fitzgerald knew that he had medicine to take, and was told by appellant that he could not eat anything and was suffering from malaria.

Appellant was, at the time, under fear of being lynched. He told Mr. Fitzgerald that he was afraid, and "wanted to die a decent death." He was told by Mr. Fitzgerald that the people believed that he was guilty, and that the body found was that of the deceased. Mr. Fitzgerald testified that, at the time of the conversation with appellant he did not know whether the body found was that of Elston Brewer, the deceased, and that he had no definite knowledge relative thereto until appellant's confession. We quote from the testimony of Mr. Fitzgerald to show what statements were made by him to induce appellant to confess:

"Q. How many trips did you make to see him? A. Three. Q. What happened between you and Mr. Johnson at the jail on your first visit there? A. Well, I tried to get him to confess. Q. What did you say to him to induce him to confess? A. Nothing specially; I told him I thought he was guilty. I heard the testimony at the coroner's jury; and he looked listless and nervous, and I didn't think he would have any peace until he unburdened himself of this awful crime I thought he had committed. Q. You told him also you were a Spiritualist, and could look down in his soul and see the black crime he had committed? A. I didn't tell him that way. I went up there that evening and said, 'You better confess; that boy we dug up there, these printers say, to the best of their knowledge, it is Elston Brewer, and there is no doubt about your guilt, and you have not slept a wink

since you killed that boy, and you won't have any peace until you confess;' and I asked him what church he belonged to and he had better look beyond the grave for comfort; that his only hope was salvation, and asked him what church he belonged to; and he said he didn't have much training at all, and went to the Baptist and Methodist Church; and I told him we had some mighty good ministers in town, and if he wanted one I would get one; and he said, 'No,' he didn't want one then, but he would see about it later; and he said, 'What are you, anyhow?' and I said, 'I am a Spiritualist, and I can look down in your black heart and see this diabolical crime you committed at midnight the other night.' I was hitting in high places when I said that, of course."

Thus far the facts and circumstances connected with the making of the confession by appellant have been stated by us from the testimony of Mr. Fitzgerald. Upon one of his visits to the jail to see appellant, Mr. Fitzerald was attended by another prominent newspaper man of the city of Vicksburg, Mr. F. P. Cashman, city editor of the Evening Post. Mr. Cashman testified that appellant was very sick when he visited him with Mr. Fitzgerald. Continuing his testimony, Mr. Cashman said that appellant was lying on his cot, and great beads of perspiration breaking out on his forehead and his hands and all portions of his cheek, and he was tossing from one side of the cot to the other, and turning over, and sat up awhile and laid down awhile, and his sentences were disconnected, and looked like he was mentally deranged." He further stated that Mr. Ftzgerald talked to appellant for a length of time which appeared to witness to be about an hour, and was telling appellant that "he was a liar and a murderer, and he better confess and ease his conscience.' Mr. Cashman visited appellant next morning about 11 o'clock, shortly after the confession had been given Mr. Fitzgerald, and he testifies that he found appellant still sick, suffering with fever and in an abnormal condition.

Viewing all the facts and circumstances surrounding the securing of the confession, we do not believe that it was of such free and voluntary character as to render it admissible in this case. It is well-nigh impossible to have a fixed rule by which may be determined the amount or degree of improper influence necessary to make a confession involuntary. It was said by Judge HANDY, in the opinion of *Simon* v. *State*, 37 Miss. 288, that:

"It is a very familiar and well-established rule that a confession is not admissible in evidence, unless it is made freely and voluntarily, without restraint, and without hope of reward or fear of punishment."

A confession cannot be said to be in every respect freely and voluntarily made if it has been obtained by any sort of threat or violence, or any promise, direct or implied, or by the exertion of any influence. Underhill on Criminal evidence (2d Ed.), sec. 126. Mr. Underhill, citing the case of *People* v. *McMahon*, 15 N. Y. 384, makes the following quotation in his note on this subject:

"'Voluntary' is not always used in contradistinction to 'compulsory.' In many cases 'voluntary' means proceeding from the spontaneous operation of the party's own mind, free from the influence of any extraneous disturbing cause."

It has been held by this court that a confession should not be admitted if there is a reasonable doubt as to whether it was freely and voluntarily made. Concerning this, we quote from Brame & Alexander's Mississippi Digest, p. 318:

"If, on preliminary hearing by the court, there is a reasonable doubt as to whether a confession was freely and voluntarily made, it must be excluded from the jury —citing *Ellis* v. *State*, 65 Miss. 44, 3 So. 188, 7 Am. St. Rep. 634; *Williams* v. *State*, 72 Miss. 117, 16 So. 296; *State* v. *Smith*, 72 Miss. 420, 18 So. 482. And, after a confession has, on preliminary hearing by the court, been admitted to go to the jury, either party may introduce

the same evidence as was submitted to the court, and any additional evidence relative to its weight or credibility, and, if it then, or at any stage of the trial, appears that the confession was made under circumstances rendering it incompetent, it should be excluded—citing *Ellis* v. *State,* 65 Miss. 44, 3 So. 188, 7 Am. St. Rep. 634; *Williams* v. *State,* 72 Miss. 117, 16 So. 296; *Simmons* v. *State,* 61 Miss. 243.''

It is necessary to look to all the surroundings of the person making the confession in order to determine whether it is rendered inadmissible because it resulted from fear or threat or the undue influence of a person, even though one not in authority, operating upon the mind of the person confessing. Even the acts of third persons may amount to a threat excluding confession, though no objectionable words are spoken. Bishop's New Criminal Procedure, secs. 1237, 1238. *Ammons* v. *State* (sweat box case), 80 Miss. 592, 32 So. 9, 18, L. R. A. (N. S.) 768, 92 Am. St. Rep. 607.

In the case at bar, to the surrounding circumstances must be added the vivid expressions and denunciations made by the person to whom the confession was given. Appellant was friendless and a stranger in the city. He was charged with the gravest offense known to the law and imprisoned therefor. He was ill and in a nervous and weak physical condition. He was under fear of mob violence. In this condition he was visited three times within twenty-four hours by a strong man, one who was experienced in obtaining confessions, and who visited him only to secure his confession. The very words used in the effort to obtain the confession was enough, under the circumstances, to put appellant, already sick and excited, in nervous dread. We cannot see that appellant was unaffected by all these things. It does not appear that the confession was from the ''spontaneous operation'' of appellant's own mind. It was not free from extraneous causes and influences. It was not free of constraint.

We do not impugn the motives of Mr. Fitzgerald in the matter. He is shown to be a zealous citizen. His very zealousness, however led to a course of conduct resulting in an influence, the exertion of which on the mind of appellant was sufficient to render his confession not free, and not voluntary.

The influence flowing from Mr. Fitzgerald's words cannot be relieved of objection by the claim that they only appealed to the spiritual hopes or fears of appellant; for a consideration of all he said to appellant, in connection with surrounding circumstances, will show that there was more than spiritual influence in this case. By "spiritual," as used to define hopes and fears which may be held out to one charged with a crime when a confession is sought, we understand to mean that which pertains to the soul or higher endowments of the mind in its relation to the Spirit of God—the Holy Spirit—and that which pertains to our holy religion. The spiritual nature of a man would be his higher self, not the carnal. We understand from the facts in this case that, when Mr. Fitzgerald claimed he was a Spiritualist, he was not meaning that he was one who was spiritual or spiritually minded in the sense we have just given; but on the other hand, he was claiming to have some power through intercourse with the spirit world—the realm of the supernatural—to have the hidden power of occultism, or, as a spiritual medium, to divine the very thoughts of the accused. A man ill and nervous could be thrown into a serious physical fear and constraint, even though from superstition, which is a fear of that which is unknown or mysterious, by the intense statement of one who claimed he was a spiritualist—that is, one who holds communications with departed and disembodied spirits—and said that he could see into his black heart and detect guilt.

We do not believe that appellant has been given the fair trial guaranteed to him by our fundamental laws, free from the admission and influence of incompetent tes-

107 Miss. 14

timony. In this consideration, we are dealing only with the action of the trial court in refusing and failing to exclude the confession made by appellant to Mr. Fitzgerald. We conclude that it was shown during the trial of this case that the confession was made under such circumstances as to render it incompetent as evidence, and that it therefore should have been excluded by the court.

For the error of the court in not doing so, this case is reversed and remanded.

*Reversed and remanded.*

SMITH, C. J., delivered a dissenting opinion.

Some time in July, 1913, Mr. George Dillon discovered the body of a dead man floating in the canal at Vicksburg. When drawn to the shore it was found that the skull of the dead man had been crushed, and that the body had then been incased in a sack and wrapped in a quilt, to which rocks and stones had been attached with sash or tiller cord. This body was afterwards identified as that of Elston Brewer, a young man twenty-six years of age, who, together with appellant, had gone to Vicksburg from some point in Arkansas, probably Cave City.

Brewer was the owner of two small boats, one of them being a house-boat in which he and appellant lived. He was a printer by trade, and, according to the testimony of his father, was at the time going down the river on a pleasure trip. According to the confession of appellant, he and Brewer had started for New Orleans, Brewer promising to give appellant a job, the nature of which does not appear. Before the finding of this body, appellant had mentioned the disappearance of his partner, Brewer, and when he saw the body, which seems to have been drawn ashore near the boats in which he and Brewer lived his actions were such as to arouse the suspicions of those who saw him.

A day or two before the finding of this body, appellant went to the Merchants' National Bank of Vicksburg,

told one of the officers thereof that his name was Brewer, and asked him how he could obtain some money, and was told "to have some bank to wire us to pay him the money and waive identification." This bank afterwards, on July 16th, received a telegram from a bank at Batesville, Arkansas, directing it to pay Brewer the sum of fifty dollars, and to waive his identification.

On the day before the receipt by the bank of this telegram—that is, on the 15th of July—appellant went to the office of the Western Union Telegraph Company and delivered to the operator in charge the following telegram, which was accepted and sent by the company:

"To G. W. Brewer, Phone Cave City, Ark., Batesville, Ark. Want larger boat. Coming back. Wire fifty dollars at once to Merchants' National Bank without identification. Letter follows. Elston. (Subject to delay.)"

G. W. Brewer was the father of Elston Brewer, and when the telegram was delivered to the operator by appellant he told her that G. W. Brewer was his father. Appellant was identified by the officer of the bank with whom he dealt, and by the telegraph operator, as being the man who made the inquiry at the bank, and as the man who sent the telegram above referred to. This telegram addressed to Mr. G. W. Brewer was received by him, and the telegram from the bank at Batesville to the bank at Vicksburg was sent at his request.

After being arrested and placed in jail, appellant confessed to several parties on different occasions that he had killed Brewer, his confession being, in the language of the witness Fitzgerald, as follows:

" 'The boy promised me when we left Arkansas that he would go to New Orleans, and after he got here he made up his mind to make his way back home.' And I think he said he was going to sell the boats and go back and send him adrift, or make his way back to Memphis and go home, and said: 'We quarreled a good deal about it Sunday and Sunday evening; we read a while, and I

cooked supper, and we played cards again, and we quarreled again, and we used the quarrel; I knew Elston pretty well, and I didn't think he was treating me right, and the boy went to bed about ten o'clock, and about one or two o'clock—some time after twelve, I don't remember the exact time—I got up and he was asleep, and I went and got the ax and hit him one lick in the head, and he groaned and made a loud noise, and I was afraid the passersby would hear him, and I went back and hit him until he was perfectly still.' And then he said: 'I got out; the boat was by the Y. & M. V. depot, and I came up and sat on the curb for a while, and went up on Washington street, and first thought I would give myself up, and studied about that for a while, and went back on the boat and got a sack and put some stones in it, and tied the sack around Elston's body and turned the boat around and shoved him overboard, and he sank.' ''

A few days before he was killed, Brewer had attempted to sell his boats; one of the parties to whom he attempted to sell being Mr. Dillon, the gentleman who afterwards discovered his body floating in the canal. That Brewer was murdered seems not to be open even to the suggestion of a doubt, the only fact to be determined being the identity of the murderer.

The only ground upon which a reversal of the judgment of the court below is asked in which there can be any sort of merit is the one upon which my Brethren think the judgment should be reversed, and that is that the court erred in admitting the testimony of Mr. E. A. Fitzgerald, to whom one of the confessions introduced in testimony was made. The ground upon which the reversal is placed is that this confession was not "in every respect freely and voluntarily made," and because "it does not appear that the confession was from the 'spontaneous operation' of appellant's own mind."

Confessions are nothing more than a particular class of admissions against interest, are always competent

when it appears that they were not obtained under such circumstances as destroy their trustworthiness, and the rule is, stated negatively, that a confession is not admissible in evidence when it appears that the defendant was coerced into making it by violence or threats of temporal injury, or was induced to make it by a promise of some material temporal benefit; the theory upon which a confession so obtained is excluded being that it is untrustworthy, for the reason that it may have been made without regard to its truthfulness, in order that the person making it might be relieved of pain or threatened injury, or in order that he may obtain the benefit of the promise made. If the alleged coercion or promise is not of such character as will probably bring about this result, the confession is admissible; all doubts as to its admissibility, when such arise, being resolved against it. This is all that is meant by the rule that confessions must be free and voluntary, as will be readily seen by an examination of the facts in the cases in which the rule has been so announced. 1 Wigmore on Evidence, sec. 821, *et seq.*

As stated by this author in section 822:

"The ground of distrust of confessions made in certain situations is, in a rough and indefinite way, experience. There has been no careful collection of statistics of untrue confessions, nor has any great number of instances been even loosely reported; but enough have been verified to fortify the conclusion, based on ordinary observation of human conduct, that under certain stresses a person may falsely acknowledge guilt. This possibility arises wherever the innocent person is placed in such a situation that the untrue acknowledgment of guilt is at the time the more promising of two alternatives between which he is obliged to choose; that is, he chooses any risk that may be in falsely acknowledging guilt, in preference to some worse alternative associated with silence. What are the circumstances which may make such an acknowledgment preferable? They are usually described

as involving either a promise or a threat. Thus a prom-
ise of certain pardon, when attached to a confession, may
conceivably make a confession, irrespective of its truth,
seem more desirable than silence with its contingencies;
or a threat of instant hanging by a mob, unless a confes-
sion is forthcoming, may conceivably make the contingen-
cies of a confession more desirable than the certain con-
sequences of silence. It is this way that a confession of
guilt may become untrustworthy as testimony.''

Bearing in mind this rule, let us now examine the evi-
dence relative to the making of this confession. When
Mr. Fitzgerald was introduced as a witness, ''at the re-
quest of counsel for defendant, the jury was ordered
to retire from the courtroom,'' and he was then examined
with reference to the circumstances surrounding the mak-
ing of the confession. From this examination it appeared
that he had three separate and distinct conversations with
appellant: First, ''about twelve or one o'clock, after the
coroner's verdict was rendered;'' second, ''that evening
about seven o'clock;'' and, third, the next morning at ten
o'clock, the confession being made at the last interview.
Fitzgerald admitted that he was trying to find out who
had killed deceased, both for the reason that he thought
it his duty as a citizen to do so, and for the further rea-
son that he wanted the information for the newspaper
with which he was connected. He was asked if during
either interview he held ''out any hope of reward or
offer of help or aid of any kind or character at any time
. . . or any threat or fear of punishment to him if he
did not make a statement,'' and he stated that he did not.
On the first visit he only talked with appellant about fif-
teen minutes, and what he said to him can be best stated
in his own language:

''I told him I thought he was guilty and there would
be no peace on earth for him this side of the grave, and
the best thing he could do was to confess and try to save
his soul; salvation was what I talked to him about more
than anything else.'' (Record, p. 71.)

At his next interview with appellant, which occurred at seven o'clock in the evening, and which lasted about five or ten minutes (Record, p. 71) he said to appellant: '' 'You better confess; that boy we dug up there, these printers say, to the best of their knowledge, it is Elston Brewer, and there is no doubt about your guilt, and you have not slept a wink since you killed that boy, and you won't have any peace until you confess.' And I asked him what church he belonged to, and he had better look beyond the grave for comfort, that his only hope was salvation, and asked him what church he belonged to; and he said he didn't have much training at all, and went to the Baptist and Methodist Church; and I told him we had some mighty good ministers in town, and if he wanted one I would get one; and he said, 'No,' he didn't want one then, but he would see about it later; and he said, 'What are you, anyhow?' and I said, 'I am a Spiritualist, and I can look down in your black heart and see this diabolical crime you committed at midnight the other night.' I was hitting in high places when I said that, of course." (Record, p. 75.)

At the third interview, which occurred at about ten o'clock the next morning, all that Fitzgerald said to appellant in this connection was: '' 'Well, you had another restless night; I see you never slept a wink last night. Are you ready to confess this morning?" And he said: 'Yes, boys; I am ready to tell you all about it.' '' (Record, p. 76.)

Appellant then proceeded to make confession.

On this visit Fitzgerald was accompanied by Mr. Fox, manager of the Western Union Telegraph Company, who was also introduced as a witness to the confession. He was asked the following question:

"Tell the jury whether or not you or Mr. Fitzgerald, either one, at that time held out any hope of reward or aid, or threatened him, to make any statement or confession to you or Mr. Fitzgerald." (Record, p. 94.)

To which he replied:

"None whatever; I don't think there were two words before he made the remark and said: 'Well, boys, I am ready to confess this morning.'" (Record, p. 94.)

The statement made by appellant to Fitzgerald as to his fear of being lynched was made at the second interview, was not caused by anything said to him by Fitzgerald, and there is nothing in the evidence to indicate that the confession was made on account of any fear of being lynched. (Record, pp. 71 to 77.) All that appellant said with reference to any fear of being lynched was that he didn't want to attend a preliminary hearing, for the reason that he was afraid he would be lynched, and Fitzgerald told him he could waive examination, and would not be out of jail more than twenty minutes.

When the court was called upon to rule on the competency of Fitzgerald's testimony, no testimony except that of his own had been introduced, or sought to be introduced, with reference to the circumstances surrounding the making of this confession. From that it did not appear whether, at the time of making the confession, appellant was sick or well. After the confession had been admitted, and on cross-examination by counsel for appellant, Fitzgerald stated that, while he did not know it of his own knowledge, he thought appellant was under treatment of a physician and was taking medicine at the time; that appellant spoke of having contracted malaria on the river; but that his condition appeared to him (Fitzgerald) to be normal.

It will be observed from this statement that appellant was not threatened with any temporal harm in event he declined to confess, or promised any temporal benefit in event he should do so. What was said to him, in effect, was simply this: That Fitzgerald, by reason of being a Spiritualist, knew that he had committed the crime, and that, by reason of his having committed it, he would have neither peace here nor salvation hereafter, unless he con-

fessed it; that "the best thing he could do was to confess and try to save his soul."

From this it will be seen that the punishment with which appellant was threatened if he did not confess and the benefit which he was told he would obtain by confessing were both predicated upon a belief in a life beyond the grave and upon a future state of punishments and rewards.  In numerous decisions it has been held that exhortations invoking the terrors of punishment predicated upon theological beliefs, and the holding out of hopes of a spiritual nature do not make the confession thereby obtained incompetent, as will appear from an examination of the authorities cited by Wigmore to section 840 of volume 1 of his Treatise on Evidence, and collated in a note to *State* v. *Williams,* Ann. Cas. 1913B, 310.

No case holding the contrary has come under my observation, and, according to Mr. Wigmore, no such case can be found.  "It is obvious that, in their ordinary aspect, the influence of religious considerations makes entirely for truth in a confession, and not against it. Mr. Joy's exposition of this point can never be improved upon:

"1842, Mr. Joy, Confessions, 51:  'It seems difficult to imagine that a man under spiritual convictions and the influence of religious impression would therefore confess himself guilty of a crime of which he was *not* guilty; or that a man under a strong sense of his spiritual relations with God could hope to please God by a falsehood; that a "confidence created" between him and his pastor, or the "being thrown off his guard" by this confidence, should induce him not to confess (*that* it might naturally do if he were guilty), but induce him to confess *falsely.* Such spiritual convictions, or spiritual exhortations, seem, from the nature of religion, the most likely of all motives to produce truth.  They are therefore of a class entirely different from those that exclude confessions. A confession is excluded because the motive which in-

· duces it is calculated to produce untruth, because it is likely to lead to falsehood. If temporal hopes exist, they may lead to falsehood. Spiritual hopes can lead to nothing but truth.' " 1 Wigmore on Evidence, sec. 840.

This point was expressly decided by our old high court of errors and appeals in *Frank* v. *State*, 39 Miss. 711, wherein the court said:

"Anything reasonably tending to hold out the hope or promise of reward or benefit for confession, or of punishment or injury for the failure to confess, is in law an unwarrantable inducement to confess, which renders the confession so obtained incompetent evidence. But there may be other 'inducements' held out to a party which are not within this rule. An appeal to the character or circumstances of a party, to his family connection and situation in life, to the claims of justice of others whose rights or safety were involved in his declaring the truth, *to his responsibility to a tribunal above all earthly courts for his falsification or suppression of the truth*—these and others might very naturally be an 'inducement' to a party to make a confession. Yet a confession so induced would not necessarily be incompetent; for the inducement would not be illegal."

If the testimony of Mr. Cashman referred to in the opinion in chief is material, it can be only on the theory that at the time appellant made this confession his mind was in such condition because of his illness that he was incapable of knowing and appreciating what he was doing, and I do not understand my Brethren to predicate the reversal on any such ground. Moreover, this testimony was not before the court when the confession was admitted, and after the introduction of Cashman's testimony the court was not requested to exclude the confession, and, in the absence of such a request, was not called upon to do so. The testimony is of no material value, however, because Cashman was not with Fitzgerald when the confession was made. The interview about which he

testified was the second one which took place on the evening before the making of the confession.

But, even if it should be conceded that this confession was obtained by Fitzgerald under circumstances which render it ordinarily incompetent, the judgment of the court below should not be reversed, for the reason that at least two other confessions were made by appellant and introduced in testimony, one to Dr. Hicks at a time when it is manifest from the evidence that whatever fear or hope may have induced the confession to Fitzgerald had passed out of his mind, or, rather, was not then influencing him in what he said, and another to Mr. Cashman, who was introduced and testified, not in behalf of the state, but in behalf of appellant himself. Any ground for reversing the judgment of the court below because the admission of the confession to Fitzgerald therefore disappears, for the reason that all doubt of the trustworthiness of the confession has been removed, because of its confirmation by appellant on two separate occasions.

And, moreover, since the facts contained in his confession to Fitzgerald were fully proven by these two other confessions, and the verdict was fully supported thereby, no harm was done appellant by the admission of Fitzgerald's testimony, even though it be conceded to be incompetent, for this court has decided "many a time and oft" that it will not reverse the judgment of a court below because of the admission of incompetent evidence to establish a fact otherwise sufficiently proven, and that "a judgment which is fully supported by competent evidence will not be disturbed because of the admission of improper testimony." See the legion of Mississippi cases in support of these two propositions cited in 1 Miss. Dig., p. 157, sec. 1051.

Had the confession made to Fitzgerald been excluded and the ones made to Dr. Hicks and Mr. Cashman been admitted, and the one testified to by Dr. Hicks was ad-

mitted without objection, there can hardly be a doubt
but that the verdict rendered would have been the same
as it now is.   When Dr. Hicks asked appellant if he had
made a confession, he replied, ''Yes; I have made a clean
breast of it.''   Then, in the language of the witness:

''I asked him why he made the confession, and he said
'Because I am tired of it; all life has been nothing but
days of darkness to one of sunshine to me for the last ten
years, and life holds no pleasure to me, and I had as
soon die as live, and I had rather they hang me than stay
one year in the penitentiary, and the quicker the better;
I wish they would do it tomorrow.'   And I asked him
what end of the ax he hit him with, and he said: 'I hit
him first with the blunt end, and then he groaned and
groaned, and made a noise I thought would attract at-
tention, and I went back and struck him two or three
more licks until he ceased all groaning or noise.'   And I
asked him why he did that.   He said: 'Well, I don't
know, except I didn't think I had been treated right or
fairly.'   And I said: 'In what way?'   I said: 'In what
way have you been treated unfairly?'   And he said:
'Well, Mr. Brewer brought me down here under the pro-
mise he would look after me and give me a job;' and
said, 'I got here, and the financial outlook was not as
bright as Mr. Brewer hoped for, and he abruptly told
me he was going to sell his boats and disband and go
back, and I would have to shuffle for myself, and I got
mad about it, and thinking over the matter, and the more
I thought of it the madder I got, and I went out on the
front part of the boat, and sat out there and meditated
over it for an hour or more, and determined to kill him,
and went back and struck him with the ax.''   (Record,
p. 85.)

For these reasons, I think the judgment of the court
below should be affirmed.