WRIGHT v. STATE.

(In Banc. April 23, 1945.)

[22 So. (2d) 1. No. 35711.]

Stovall Lowrey and William H. Maynard, both of Clarksdale, for appellant.

**Greek L. Rice,** Attorney General, by **R. O. Arrington,** Assistant Attorney General, for appellee.

Argued orally by **Stovall Lowrey** and **William H. May-nard,** for appellant, and by **Geo. H. Ethridge,** for appellee.

PER CURIAM. The appellant, Jesse Oliver Wright, a negro, was convicted of the crime of rape, alleged in a proper indictment to have been committed by him upon a married white woman, and he was thereupon sentenced to death by electrocution for his alleged offense.

The verdict of the jury is based primarily upon certain confessions made by the accused under circumstances which disclose without any substantial contradiction that they were made under extreme fear on his part that if he continued his denial of guilt he would be kept over night in the local and insufficiently guarded city jail, where he was.admittedly frightened beyond self-control over the prospect of mob violence, and also under express promise made prior to the confessions that he would be promptly removed from this jail and turned over to the sheriff, who immediately brought him to Jackson for protection.

All of the judges agree that these confessions were not free and voluntary for the reasons above stated, and that they should therefore not have been admitted in the evidence, while Justices McGEHEE, GRIFFITH and L. A. SMITH, SR., are of the opinion that a judgment should be rendered here discharging the appellant under the evidence disclosed by the record. The result is that the cause is to be reversed and remanded for a new trial. Reversed and remanded.

## PARTIALLY DISSENTING OPINION.

**McGehee, J.,** delivered a partially dissenting opinion.

From a conviction of the crime of rape and sentence to suffer the death penalty, the accused, Jesse Oliver Wright, has prosecuted this appeal, assigning as error, among other things, as ground for the reversal of the

case, the action of the trial court in admitting in evidence certain confessions made by him under the circumstances hereinafter mentioned.

The prosecutrix, a young white woman, whose husband was in the naval service at the time of the alleged assault, testified that when she left her work as a waitress at the Greyhound Bus Station, in the City of Clarksdale, on the night of December 17, 1943, at nine o'clock, and was walking along the sidewalk in the residential section of the city enroute to her home on one of the most traveled thoroughfares therein for through passage, she was accosted by a negro man, who seized her by both hands, pulled her across a sixty-foot street mostly by the hair, carried her behind a large cedar shrub about twenty feet from the sidewalk on a lot beside a vacant house, located between and in close proximity to occupied residences, and there tore her "panties" off and forcibly ravished her; that when he first seized her on the opposite side of the street, which was also in front of a line of occupied residences, her assailant was wearing gloves, one of which, a "cadet glove" of the same design as those issued to the military authorities at the Clarksdale Flying Field, is claimed to have been later found near the cedar at the scene of the alleged rape, together with the "panties" above referred to; that before crossing the street she was told by her assailant not to scream or he would kill her with his knife, but which knife was not ever displayed, and that during the encounter he hit her in the mouth, burst her lip, and bruised her eye and knees very badly, although she failed to say whether this occurred while she was being pulled across the street or later; that at the scene of the crime she asked the negro whether or not he lived in Clarksdale, and that he replied, "No, I came down from Memphis"; that while they were behind the cedar and the crime was being committed, "one person passed and stood up on the sidewalk, and as they were standing there, he saw them, so did I, and I started screaming again, and he cursed them, told

them to go on down the street to where they belonged, and whoever this was walked off''; that thereafter she started on home, and when she arrived at the nearest street light about three hundred feet away on this street, which was thickly lined on both sides with large trees, her assailant was still standing on the sidewalk near the scene; that she reported the occurrence as soon as she arrived at home, where she resided with her married sister and where her father was present on that particular night; and that the family immediately notified the police.

The prosecutrix was corroborated by the family and others as to the signs of violence testified to by her, and in regard to her having promptly reported the alleged occurrence. Also, the officers testified to having gone to the scene with her immediately thereafter, and of finding the grass beaten down behind the cedar shrub, where they were able in the darkness of the night to find, by the use of a flash light, the glove and the torn undergarment.

The testimony further shows, however, and without material conflict, that the prosecutrix then contended that her assailant was a big, black, heavy-set negro, approximately 5 feet and 8 or 9 inches tall, and wore his hair pompadour style; whereas the accused at the bar, although wearing his hair in pompadour fashion as is the custom among many young negro men, is not a big, black, heavy-set negro but a small, light-brown negro of slender build, only 5 feet and 2 inches tall, smaller than the prosecutrix, and weighs only 125 pounds; and the proof further discloses that shortly after the alleged occurrence and long prior to the arrest of the appellant, she pointed out to one of the officers a large, black, heavy-set negro, saying that, ''There is a negro who looks something like the negro.''

The accused, Jesse Oliver Wright, who had been discharged from the army on account of an ulcerated stomach, and who had worked regularly subsequent to the alleged crime on December 17, 1943, at a bakery, pressing

shop, and other places near the bus station where the prosecutrix continued to be employed, was taken into custody by policeman McLaughlin for the first time on June 3, 1944, for investigation on "suspicion," but without it having been previously suggested by the prosecutrix that he was her assailant, and without his having said or done anything, so far as the record discloses, to indicate that he may have had anything to do with this alleged crime. Moreover, it does not appear from the testimony of the prosecutrix that she was given an opportunity during the intervening period of approximately six months to see if she could identify him as a suspect of McLaughlin, although he had necessarily been on the streets daily in going to and about his work during that time, and his alleged victim testified as a witness on the trial, "Why, I could never forget that face."

After the appellant was arrested by McLaughlin as he was leaving home for work at 6:30 a. m., he was thereupon immediately placed in the city jail. Then at 7:30 a. m. he was taken out for photography under flashlights and for finger printing, after which he was returned to the jail and again removed therefrom at 8:40 a. m., when he was questioned about matters having no direct relation to his alleged crime, without being advised of the cause of his arrest, and at which time the prosecutrix was also given an opportunity to identify him and failed to do so with any dependable degree of positiveness,—saying later on the witness stand that at that time "I was not so sure." Then at 9:30 the prisoner was again removed from the jail, exhibited to a Mrs. Farmer for identification (but without success so far as the record reveals, since she did not testify), and then carried to his home by McLaughlin for some purpose not disclosed by the record, and later was placed back in jail. He was again soon removed therefrom during the same forenoon and questioned further by policemen McLaughlin and Faris, when he had reason to think from their questioning that he was being investigated as a suspect in connection with

the theft of some gloves and other government property which had disappeared from the Flying Field where the accused had worked for a short time prior to the alleged assault, and he was asked if he had any gloves, and if so, whether he could identify one of his gloves if they showed him one of them. And being confronted with the alternative of either claiming the glove or being charged with its theft, he replied in the affirmative, was shown a glove and identified it as one which he said was given to him when he worked at the Flying Field. He was thereupon again placed in the jail, without being informed that he was being held in connection with the alleged crime of rape or of the fact that the glove shown to him was said to have been found at the scene thereof. Therefore this admission against interest was not freely and voluntarily made with full knowledge of its nature and consequences as a confession, but as the result of a piece of subtle trickery if McLaughlin's version of what transpired is to be accepted as true. Again, he was removed from the jail at 1:30 p. m. and questioned by these two policemen for an hour, and during which time McLaughlin testifies that he was asked by policeman Faris (who was not offered as a witness) whether he had heard about a white lady being "grabbed by a negro on De Soto Street," and then informed him that the glove which he had identified as his own was found there, to which the prisoner replied, "No, sir, not that glove." Thereafter the accused was placed back in the jail, was taken out again at 4 p. m. and questioned for a half hour by McLaughlin alone in a closed room, where this officer claims that the first break in the case came when the prisoner admitted to him that he was the one "who grabbed the white lady." Then, according to McLaughlin, he placed the accused back in jail without obtaining any details as to what the prisoner's version might be of what occurred at the scene of the alleged rape, and failed to report to the chief of police or any other officer the solution of the alleged crime which had so long remained unsolved (not-

withstanding that a statement contained in the brief for the appellant is unchallenged, to the effect that substantial rewards had been advertised in the public press in that behalf), but went on to his home as if nothing eventful had transpired, still lodging no complaint against his prisoner whom he had arrested and was still holding in custody without warrant.

The accused testified that at this secret session with McLaughlin he was struck on each side of the head with a flat blackjack, and that this officer hit him in the mouth with his fist or hand, and also threatened to further beat him unless he was ready to tell everything by the time the officer returned from supper. The officer denied this, and the decision of the trial judge on this conflict of the evidence must stand wherein he held that the accused was subjected to neither threats nor violence on the part of the officers as an inducement to the confessions hereinafter referred to.

McLaughlin admitted, however, that the accused was very nervous during these conferences, and asked for protection from what others might do to him; that he was afraid that ''the public might rise up and do something to him;'' and that he promised him not to let anybody bother him; that this occurred before the accused said that he was the one ''who grabbed the white lady,'' and that he was so nervous and scared that he, on more than one occasion, had to put him back in jail until he could get control of his nerves; and that when he left the jail he told the accused that if he wanted to talk to Chief Longino or policeman Faris, he could ''peck on the door of the jail'' and the desk sergeant would get in touch with them.

Then as the day was drawing to a close, and the shadows of darkness were soon to fall, and while the accused was brooding over his experience of having been exhibited to two white women for identification—a not unusual token and forecast of the fate which sometimes awaits one of his race thus accused—he seemed to have become more

fearful and terrified on account of his supposed lack of personal safety in the city jail, which was in close proximity to the desk of the elderly sergeant who was frequently on guard alone and known by him to have the keys. And although he had steadfastly refrained for nearly two hours from adopting the suggestion of McLaughlin of "pecking on the door" and sending for Chief Longino, he finally did so; and after first inquiring whether the prosecutrix had said he was her assailant and receiving no information in reply except the implication contained in the statement that "We have some evidence that we are going to bring to court," he asked the Chief for protection from violence, and was thereupon assured, before making any confession to him, that he would be protected from violence on the part of anyone who might try to get him out of jail—that being what the Chief says he understood him to mean—and would not be kept in that jail, but would be "turned over immediately to the sheriff," who was at the city hall and received him for transportation to Jackson as soon as the confession which he then made to Chief Longino could be repeated shortly thereafter for the benefit of McLaughlin and others as witnesses. And although the record fails to disclose any evidence that a mob was about to gather near the jail, or that there was one in the offing, the fact remains that the sheriff himself shared to some extent the apprehension of the accused in that regard since it is shown that while he was bringing the prisoner to Jackson he caused him to lie down in the automobile where he could not be seen as they passed some of the towns and villages en route.

The confession made by the appellant on that occasion to Chief Longino and repeated as aforesaid in the presence of these other officers a few minutes later was sufficient in detail to fit reasonably well into what the public generally may have read in the local newspapers and heard about town during the intervening six months in regard to the account given by the prosecutrix, but

the accused had difficulty in relating the same story to McLaughlin and others that he had told to Chief Longino; and when his attention would be called by the Chief to these flagrant discrepancies, he was ordered by McLaughlin more than once to "get back on the line." For instance, he told Chief Longino in the confession made to him alone that he waited for his alleged victim about thirty minutes at the place where he first "grabbed" her, but when he undertook to repeat the story immediately thereafter as aforesaid, he claimed to have stepped in behind and followed her, as claimed by his alleged victim, for quite a distance before reaching the scene.

While we would not be warranted under the evidence in disturbing the finding of the trial judge when he held the confessions to be free and voluntary so far as the alleged threats and violence toward the accused by McLaughlin are concerned (and it is not claimed that Chief Longino or any of the other officers mistreated him), it is nevertheless clear that a confession made under the circumstances hereinbefore set forth is made under as great fear as one thus accused could entertain, and induced by the hope of thereby realizing his desire to get to a place of safety without delay. And it is immaterial that his fears in regard to "the mob crowd" that he mentioned may have been wholly unfounded, or that it was the right and duty of the officers to promise him protection. The question is,—did he freely and voluntarily make the confessions, or were they induced by fear and the hope then held out to him in advance that he would not be kept in a jail where he was admittedly scared of mob violence.

Freedom from fear is one of the great freedoms for which all civilized peoples in the world are now striving; its attainment, at least for a time, was no doubt a sufficient inducement for the accused in the instant case to surrender his free will and be the first to charge himself with a capital offense, although entirely innocent. It is not given to everyone the power to remain steadfast and unyielding in protesting their innocence when the clouds

grow dark, the tension great, and danger is actually or apparently near.

Confessions to be admissible in evidence against one accused of crime should proceed from the spontaneous expressions of the mind, free from the influence of any extraneous disturbing cause, and each case is to be governed by the particular circumstances surrounding it. And, while we would not be justified, of course, in holding that in every case where a confession is made while the accused is under fear without regard to whether it is induced by a consciousness of guilt and the prospect of a deserved punishment commensurate with the gravity of his crime as distinguished from fear of violence, but the decision holding them inadmissible may be limited to the facts and circumstances of the case herein disclosed. Our right and duty to exclude the confessions in the case at bar is supported by the principle announced in the case of White v. State, 129 Miss. 182, 91 So. 903, 905, 24 A. L. R. 699, wherein the Court said: "Confessions induced by fear, though not aroused by spoken threats, are nevertheless involuntary, because the fear which takes away the freedom may arise solely from the conditions and circumstances surrounding the confessor; the circumstances in this case were such as to convince us that the confession was involuntary." See also Johnson v. State, 107 Miss. 196, 65 So. 218, 51 L. R. A. (N. S.) 1183; Whip v. State, 143 Miss. 757, 109 So. 697; Mathews v. State, 102 Miss. 549, 59 So. 842; Blackshire v. State, 158 Miss. 364, 130 So. 498; Fisher v. State, 145 Miss. 116, 110 So. 361; Boudreaux v. State, 175 Miss. 625, 168 So. 621; and particularly applicable is the announcement in the case of Whip v. State, supra, wherein the court said that in order for a confession to be admissible, the evidence "must exclude every reasonable doubt that the confession was [not] freely and voluntarily made." [143 Miss. 757, 109 So. 698.]

The confessions made subsequent to those hereinbefore referred to were mere repetitions of the substance of the

former ones, were induced by those previously made under fear, at a time when the accused was without the benefit of counsel to advise him of his right to repudiate the former ones if untrue, and should have likewise been excluded.

Without the original confessions, all of which the accused testified at the trial were made under fear and were not true, there was no substantial evidence against him which would have entitled the case to be submitted to the jury in view of the inherent improbabilities of the story of the prosecutrix,—at least, in so far as it tends to connect the appellant with the crime, and he should have been granted the peremptory instruction requested.

In this connection it should be observed that it was not until after the accused had made the alleged confessions that the prosecutrix made known to the police her conclusion that she could identify him as being her assailant; and this, notwithstanding that he had already been transported to Jackson and she had not seen him subsequent to her failure to identify him with any reasonable degree of certainty on the day before. Moreover, it is passing strange that the "one person" who passed along while the alleged crime was being committed and stopped on the sidewalk and was ordered by her asailant "to get on down the street where he belonged," had never reported the incident nor appeared at the trial as a witness thereto; and also that no member of the travelling public who would very likely have passed, either as a pedestrian or motorist, along this street used for most all traffic north and south by those passing through the business section of the city, claims to have heard her screaming or seen the struggle across the sixty-foot street that early in the evening. Then, too, if there had been sufficient light at the scene of the crime for the prosecutrix to have been able to recognize her assailant on seeing him again for the first time six months later, he would not have continued to work at places of business in Clarksdale near the bus station where she was still employed (and where he had

been served in the colored compartment of the bus station café by the prosecutrix prior to the alleged crime, according to the confession) so as to afford her the opportunity throughout the period of six months prior to his arrest to identify him. The mere fact that the prosecutrix may have had an experience behind the cedar bush that evening and have been then and there, or at some other place, subjected to blows and bruises by some one wearing a "cadet glove" at the cedar bush, and had thereafter told her story to her family in explanation of the injuries readily to be observed by them when she arrived at home, is not sufficient to sustain a conviction against an accused "picked up" at random by policeman McLaughlin, six months later, and against whom she had made no previous complaint, but had consistently and repeatedly misdescribed.

I concur in the reversal of the case, but I am of the opinion that a judgment should be rendered here discharging this appellant, instead of a remand for a new trial.

**Griffith** and **L. A. Smith, Sr., JJ.**, concur in the foregoing separate opinion.

PARTIALLY DISSENTING OPINION.

**Griffith, J.**, delivered a partially dissenting opinion.

In Richardson v. State, 196 Miss. 560, 17 So. (2d) 799, decided less than a year ago, attention was again called to the rule which has been followed in this state for more than a half century as regards the caution with which records involving the charge of rape must be scrutinized, and there, in a case stronger for the prosecution on its facts than the present case, the conviction was reversed, and with the further statement that except for the confession in that case, the appellant would be entitled to a peremptory charge. In the present case, as is well and

sufficiently shown in the opinion by Judge McGehee, the so-called confession was feigned and spurious, with the result that the conviction must stand, if at all, upon the testimony of the prosecutrix.

When we turn to that testimony one or the other of two conclusions must be true,—(1) that the felony, if there was a felony, was committed by a negro of large stature and great strength, and therefore by some other than this appellant, or (2) if this appellant was the person involved, then the offense at most was an assault and battery and not the felony charged, for the reason that the female, taking her own testimony as true, did not put forth the resistance which is required as an essential element in making out the felony.

The prosecutrix at first reported that the offender was a large, black negro, and steadfastly adhered to that insistence for months, and for that reason declined to identify this appellant when he was first brought before her some six months after the date of the offense, and it was only after she had heard that appellant had made a confession that she changed her version and identified appellant. The appellant is a small negro only 5 ft. 2 in. tall, weighing only 125 pounds, and is light in color. He was discharged from the army for physical disability. The prosecutrix weighs from 130 to 135 pounds, is taller than appellant, was reared on a farm and worked full hours at a restaurant. Yet she says that she was accosted by appellant about 9:30 o'clock at night on a frequently traveled paved street in a thickly populated residential section of one of our larger municipalities, near its business section, and was dragged by him entirely across this wide street and for twenty feet beyond it into a vacant lot, while at the same time he had on heavy gloves. She says she screamed, yet with residences all around, and when at that time nobody had gone to bed; nobody heard any screams. No weapon was exhibited, and so far as the record discloses the offender had no weapon. The ease with which the full offense was committed, if the version

of the prosecutrix is true, has no rational explanation, in addition to which the prosecutrix avers that while the felony was in its climactic progress a passerby stopped on the sidewalk and inquired what was happening, and that appellant told this person to keep going, and yet the prosecutrix still made no call to that person or any audible outcry.

Such a story as this may be enough for the rubber stamp of a jury, usual in the excitement of such cases, but it ought never to pass the scrutiny of a final and responsible court of review. Had the prosecutrix exerted the efforts which the law and decent society requires, this pint-sized negro could never have dragged her across this paved street, to say nothing of what happened afterwards, and her screams could and would have brought a dozen persons immediately to the scene,—and in the first place such a location for the commission of such an offense would never have been selected at such a time other than by a lunatic. Whatever happened here and whoever it was, there was no rape unless by a crazed negro of the size and strength which the prosecutrix at first described and in which she so long persisted,—not this appellant.

All the authorities are in agreement that to make out a case of rape the female must have resisted the commission of the offense, not by words but by acts, and that the resistance must be reasonably proportionate to the strength and opportunities of the woman,—that the resistance must not be a pretense, but must be in good faith and must persist until the offense is consummated. In some jurisdictions the rule is that the female must exert the utmost or most vehement resistance within her power, but the generally accepted and correct doctrine is that if the woman at the time was conscious, had the possession of her natural, mental, and physical powers, was not overcome by numbers or terrified by threats, or in such place and position that resistance would have been useless, it must appear that she did resist to the extent of her ability at the time and under the circumstances. 44 Am. Jur.

p. 905, Sec. 7; 52 C. J., pp. 1019, Sec. 29; 1 Wharton Crim. Law (12 Ed.), Sec. 734; and cases cited 2 Brill Cyc. Crim. Law, under Sec. 888. An instructive case, on facts such as here presented, is Perez v. State, 50 Tex. Cr. R. 34, 94 S. W. 1036, 1038, and therein the rule is stated in terms precisely applicable to the case now before us that ''There must be resistance on the part of the female, depending in amount on the circumstances surrounding her at the time and the relative strength of herself and the accused.''

This is a rule founded not only in the dictates of nature, but in the interest of the public peace, and as an obligation incumbent upon a female who charges that she has been injured by such an offense that she on her part do what she reasonably can to avert it. Here she says she was threatened with a knife, but no knife was exhibited, and she says the offender had on gloves, wherefore to draw out a knife and open it, the offender would have had to take off his gloves, thereby giving her every opportunity to flee down the street, screaming as she went. She could have dragged him down the street, instead of his dragging her across it, comparing their sizes and weights, had she made the exertions which the law required of her. Without pursuing the sordid details further, there is no case for a conviction here, and appellant should have had the peremptory charge.