# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00201-COA

**KENNETH JACKSON A/K/A KENNETH W. JACKSON A/K/A KENNETH WAYNE JACKSON**                                             **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                             **APPELLEE**

DATE OF JUDGMENT:                01/19/2023
TRIAL JUDGE:                     HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:       MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY:               JOHN K. BRAMLETT JR.
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 06/25/2024
MOTION FOR REHEARING FILED:

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Kenneth Jackson appeals his conviction of possessing a firearm as a felon. Jackson's sole argument on appeal is that the Madison County Circuit Court erred by failing to sua sponte order a mental evaluation. Finding no abuse of discretion by the trial court, we affirm Jackson's conviction and sentence.

## FACTS

¶2.     On April 6, 2022, Officer Christie Shoemaker with the Flora Police Department responded to a call about a man carrying a gun through a neighborhood in Flora, Mississippi. Officer Shoemaker testified that when she arrived at the scene, she observed Jackson walking

down the street "with a firearm slung over his shoulder." Officer Shoemaker testified that she recognized Jackson based on her prior interactions with him in her capacity as a law enforcement officer, and she was aware that he was a felon and that he was not allowed to possess a firearm.

¶3. Officer Shoemaker testified that she approached Jackson and informed him that he was not allowed to have a firearm. Officer Shoemaker then took Jackson's firearm and placed it inside her police vehicle. Officer Shoemaker testified that during her interaction with Jackson, she had no trouble communicating with him, and she confirmed that Jackson understood her. Footage from Officer Shoemaker's body camera showing Jackson with a firearm was admitted into evidence and played for the jury.

¶4. Officers from the Madison County Sheriff's Department arrived at the scene and eventually took Jackson into custody. Investigator Matthew Holcomb of the Madison County Sheriff's Department interviewed Jackson, and Deputy Kyle Millican was also present during the interview. Investigator Holcomb testified that prior to the interview he advised Jackson of his *Miranda*[1] rights. Jackson then signed a *Miranda* form waiving his rights. Investigator Holcomb testified that he "firmly believe[d]" that Jackson understood his *Miranda* rights and the significance of waiving his rights.

¶5. Investigator Holcomb testified that during the interview, Jackson admitted that he was a felon and that he possessed a firearm on April 6, 2022. Jackson told Investigator Holcomb that he had the gun because he was turkey hunting. Investigator Holcomb testified that the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

sheriff's department ran a criminal history check on Jackson and confirmed that he was a felon.

¶6. Jackson was eventually indicted for possession of a firearm by a felon in violation of Mississippi Code Annotated section 97-37-5 (Supp. 2021). At his trial, the jury heard testimony from Officer Shoemaker, Investigator Holcomb, and Deputy Millican. After the State rested, Jackson moved for a directed verdict, which the trial court denied. The trial court then advised Jackson of his right to testify. Jackson stated that he wanted to testify in his own defense.

¶7. Prior to Jackson's testimony, Jackson's counsel informed the trial court that Jackson "wanted to introduce the [entire] YouTube app as evidence." The trial court inquired as to how Jackson would submit an app into evidence, explaining that an app is not a physical object. Jackson's counsel informed the court that he had "explained that to [Jackson]." When the trial court asked if there was a particular video on the YouTube app that Jackson wanted to submit, Jackson responded that he wanted to submit "music" that contained his "medical history" from the past forty-four years of his life. Jackson stated that he had provided this evidence to his defense counsel, and Jackson's counsel confirmed that Jackson had sent him links to YouTube videos. However, Jackson's counsel informed the trial court that he had reviewed the videos and determined that the videos were not related to the circumstances surrounding Jackson's trial. As a result, the State objected to the relevance of the YouTube videos.

¶8. The trial court then allowed Jackson to make a statement regarding the videos.

Jackson insisted that he wanted the videos entered into evidence "because they're associated directly with my medical history for the last [forty-four] years of my life." Jackson also stated that the videos would show why he carried a firearm: "[The videos are] associated with a lot of counterintel and counternarcotic operations, and they're information leaks to the public that jeopardizes my safety and my freedom, which is why I carry a gun." Jackson alleged that all his prior medical history was being used on the YouTube app "as an entrapment scam or a fishing or trolling scam to lure criminals." Jackson claimed that he had filed complaints regarding the "entrapment scam" with the Federal Bureau of Investigation and the Madison County Sheriff's Department.

¶9. Jackson also asserted that some of the YouTube videos contained evidence from his arrest and his statements to law enforcement. When the trial court inquired as to which specific YouTube videos showed evidence relevant to Jackson's trial, the following exchange occurred:

THE COURT: What words do I put into the search bar on YouTube to get to the videos that you wish me to look at that you say make it more likely or less likely that you were in possession of a firearm?

[Jackson]: The entire Eminem catalog.

THE COURT: Eminem the artist?

[Jackson]: Yes, sir. The entire movie 8 Mile. Yellow Wolf. The entire Jason Aldean catalog. The United States White House. Donald Trump. Joe Biden. Tate Reeves.

THE COURT: All right.

[Jackson]: . . . [A]lso the information that's associated with the

4

terrorist bin Laden. I would like to submit the entire movie of the Zero Dark 30 catalog—

THE COURT: All right.

Jackson then claimed that he killed Osama bin Laden.

¶10. The trial court ultimately denied Jackson's request to introduce the entirety of the YouTube app, including the specific videos mentioned by Jackson, explaining that the evidence was not relevant and that "[t]he Eminem rap catalog doesn't make it more likely or less likely [Jackson] committed the crime alleged in the indictment."

¶11. Jackson then testified before the jury. During his testimony, Jackson recounted the events that occurred on the day of his arrest. Jackson explained that he had a firearm because he was turkey hunting. Jackson also testified regarding his interaction with Officer Shoemaker. Jackson claimed that after Officer Shoemaker turned off her body camera, she inquired about Jackson's military career, and he informed her that it was classified. Regarding his arrest, Jackson alleged that the officers from the sheriff's department informed him that they were not going to arrest him because his prior felony conviction "is associated with prior counternarcotic operations where [he] was falsely arrested." During Jackson's testimony, the audio recording of his interview with Investigator Holcomb was admitted into evidence and played for the jury.

¶12. Jackson also testified that he had a prior conversation with law enforcement officers regarding "the information leaks on the cellular phones" and what he termed an "entrapment scam." Jackson explained that he believed that the "information leaks" were a threat to his daughter's "safety and health and freedom." Jackson claimed that his daughter's dog had

5

been run over, and he grew concerned that the dog's death "was a human trafficking or a child predatory entrapment situation . . . designed . . . to lure individuals into a situation." Jackson also claimed that several songs on the YouTube app contained his medical records and files. Finally, Jackson attempted to testify regarding several conspiracy theories, including "[t]he great conspiracy theory of Osama bin Laden," but the trial court sustained the State's objections as to relevancy.

¶13. On cross-examination, Jackson agreed that he was a felon and that he pled guilty to business burglary in 2007.

¶14. The jury ultimately found Jackson guilty of possession of a firearm by a felon, and the trial court sentenced Jackson to serve a term of ten years in the custody of the Mississippi Department of Corrections. After the denial of his post-trial motions, this appeal followed.

## DISCUSSION

¶15. On appeal, Jackson argues that the trial court erred by failing to sua sponte order a mental competency examination. We recognize that a person accused of a crime may only be tried "if he is legally competent." *Creppel v. State*, 305 So. 3d 1245, 1250 (¶17) (Miss. Ct. App. 2020). A defendant is deemed mentally competent to stand trial if he has "the ability to perceive and understand the nature of the proceedings, to communicate rationally with the defendant's attorney about the case, to recall relevant facts, and to testify in the defendant's own defense, if appropriate." MRCrP 12.1(a). "[T]here is a presumption of mental competency[,]" and therefore the "[t]he burden of proof rests on the defendant to prove that he is mentally incompetent to stand trial." *Robinson v. State*, 301 So. 3d 577, 580

6

(¶15) (Miss. 2020) (first quoting MRCrP 12.1(a); then quoting *Moore v. State*, 287 So. 3d 189, 196 (¶21) (Miss. 2020)).

¶16. Our review of the record reflects that at no time during the trial court proceedings did Jackson or his attorney request a mental examination. Jackson asserts, however, that the trial court should have sua sponte ordered Jackson to submit to a mental examination. Mississippi Rule of Criminal Procedure 12.2(a) provides that "[i]f at any time before or after indictment, the court, *on its own motion* or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court shall order the defendant to submit to a mental examination." (Emphasis added). We recognize that "[w]hat constitutes 'reasonable ground' to believe that a defendant is incompetent to stand trial rests largely within the discretion of the trial judge." *Harden v. State*, 59 So. 3d 594, 601 (¶14) (Miss. 2011).

¶17. Here, Jackson maintains that his "rambling, delusional, incoherent statements to the trial court" should have provided the trial court with reasonable grounds to believe that Jackson was mentally incompetent. When reviewing whether a trial judge should have sua sponte ordered a mental examination, "the pertinent question is whether the trial judge received information which, objectively considered, should reasonably have raised a doubt about the defendant's competence and alerted the judge to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Robinson*, 301 So. 3d at 580 (¶16) (internal quotation marks omitted). "While there is no precise statement of what quantum of evidence necessitates a

trial judge to order a mental evaluation," *Bradley v. State*, 116 So. 3d 1093, 1096 (¶17) (Miss. Ct. App. 2013), the United States Supreme Court has stated that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri*, 420 U.S. 162 (1975); *accord Bradley*, 116 So. 3d at 1096 (¶17).

¶18. After reviewing the record and in light of Mississippi Supreme Court precedent, we find that the trial court did not abuse its discretion in failing to sua sponte order a mental examination of Jackson. As stated, neither Jackson nor his defense counsel raised the issue of Jackson's competency before the trial court. Defense counsel never expressed any concern that Jackson was unable to rationally communicate about his case. In fact, the transcript reflects that Jackson *was* able to communicate with the trial court, his counsel, and the officers who arrested him and interviewed him. Officer Shoemaker and Investigator Holcomb each testified that Jackson had no issues communicating with them or understanding what was happening during his arrest and interview. The transcript from the pretrial conference reflects that Jackson understood that he needed to turn over any relevant evidence to his attorney, and Jackson engaged in a coherent and rational conversation with the trial judge regarding how to present his evidence at trial.

¶19. Furthermore, Jackson testified in his own defense at trial. *See Tutor v. State*, 933 So. 2d 1003, 1007 (¶9) (Miss. Ct. App. 2006) (finding no error in the trial court determining defendant was competent to stand trial where defendant's "testimony on the stand indicated

8

that he was capable of taking the stand in his own defense and could recall relevant facts as needed while testifying"). Jackson's testimony reflects that he was able to recall relevant facts from the day of his arrest, including his interview with law enforcement. Although Jackson expressed a belief in various conspiracy theories, we find no indication that Jackson was unable to rationally communicate or unable to assist in his defense. The Mississippi Supreme Court has "emphasize[d] that competency is the ability to rationally communicate with one's attorney about the case[,]" despite the defendant's "penchant for tangents, conspiracy theories, and 'rabbit holes'" relating to the defendant's theory of the charges against him or her. *Robinson*, 301 So. 3d at 582 (¶26).

¶20. Finally, the transcript reflects that "the trial judge had the benefit of speaking with [Jackson] directly and observing [him] in person and therefore that court's conclusions about [Jackson's] competency should not be lightly disturbed." *Id*. at (¶27) (internal quotation marks omitted). We recognize that "[t]he trial judge sees the evidence first hand; he observes the demeanor and behavior of the defendant." *Id*. (internal quotation marks omitted).

¶21. After our review of the transcript and record, we find no evidence that "the trial judge received information which, objectively considered, should reasonably have raised a doubt about [Jackson's] competence and alerted the judge to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Id*. at 580 (¶16). We therefore find that the trial court did not abuse its discretion by failing to sua sponte order a mental evaluation to assess Jackson's competency. Accordingly, we affirm Jackson's conviction and sentence.

9

¶22. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY WESTBROOKS AND McDONALD, JJ.**

**McCARTY, J., DISSENTING:**

¶23. No one heard what Kenneth Jackson was telling them. His rants and digressions about YouTube and Osama bin Laden barely mask what clearly seems to be untreated mental illness. Because I believe the record is replete with reasonable grounds to order a mental evaluation of Jackson, I respectfully dissent.

¶24. It is true that "[a] criminal defendant is presumed competent." *Moore v. State*, 287 So. 3d 189, 196 (¶21) (Miss. 2020); *accord* MRCrP 12.1(a) ("There is a presumption of mental competency"). But "to be deemed mentally competent, a defendant must have the ability to perceive and understand the nature of the proceedings, to *communicate rationally* with the defendant's attorney *about the case*, to recall *relevant* facts, and to testify in the defendant's own defense, if appropriate." MRCrP 12.1(a) (emphasis added). "Competency to stand trial is measured at the time of trial." *Parker v. State*, 273 So. 3d 695, 698 (¶11) (Miss. 2019).

¶25. But there is an important caveat to this presumption: if "the court, on its own motion or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court *shall* order the defendant to submit to a mental examination." MRCrP 12.2(a) (emphasis added). Our critical inquiry is "whether the trial judge received

10

information which, objectively considered, should reasonably have raised a doubt about the defendant's competence and alerted the judge to the *possibility* that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Moore*, 287 So. 3d at 196 (¶22) (emphasis added) (internal quotation marks omitted). We review for abuse of discretion. *Id.*

¶26. Throughout the entirety of trial, Jackson was adamant about introducing "the entire YouTube app as evidence," specifically "music," claiming that it documented "[e]verything for the last 44 years of [his] life[,]" including his "medical history." Jackson further asserted that the YouTube app was "also associated with a lot of counterintel and counternarcotic operations," as well as "information leaks to the public that jeopardize[] [his] safety and [his] freedom."

¶27. Sure, it seems Jackson spoke to his attorney and the trial judge and sort of responded to questions, but the record hardly reflects that he was able to do this *rationally*. Instead, in the words of his appointed appellate counsel, Jackson offered "rambling, delusional, and incoherent statements" when the trial court asked him which videos in particular he would like to show.

> Everything for the last 44 years. Every culture. Every genre. The President of the United States. The Vice President. The Governor, Tate Reeves. The Governor of Alabama. Secretary of Defense. Department of Defense. United States military, every branch. The Sixth Branch of the United States Space Force that was added.
>
> All prior history that's associated directly with the last 44 years of my life is being used on this – in this situation as an entrapment scam or a fishing or trolling scam to lure criminals, whether they're fishing to cause harm to somebody or they're fishing to catch a cyber criminal.

I filed IC3[2] FBI complaints about it. I also sent a letter over to Madison County Sheriff's Department prior to that engagement where they showed up out on the scene and arrested me. I have had them in my yard also probably a month or so prior to that where I specifically asked Mr. Jones if he was consciously aware of this cell phone situation when I was over at the sheriff's department. He drove out to my house and I sat in the truck with him, and I asked him, What is going on here?

¶28. When Jackson took the stand in his own defense, he was asked multiple times by his attorney if there was "anything relating to the incident [in question] . . . that [he] would like to tell the jury[,]" and each time, his attorney's question was met with Jackson's "rambling, delusional, and incoherent statements." Clearly, it can hardly be said that Jackson was in a position "to *communicate rationally* with [his] attorney *about* [*his*] *case*, to recall *relevant* facts, and to testify in [his] own defense"—at least not in any meaningful sense.

¶29. If all of this doesn't objectively alert everyone in the courtroom to the possibility that something may not be right, then I don't know what would. Our court system is set up to listen, but that only works if those in the courtroom are willing to hear what's being said. The record reflects several instances in which "the trial judge received information which, objectively considered, should reasonably have raised a doubt about [Jackson's] competence and alerted the judge to the *possibility* that [Jackson] could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Moore*, 287 So. 3d at 196 (¶22). And because we are dealing with a right so fundamental to our society—a fair trial—it need only be a possibility.

¶30. Nor does a recent decision by this Court compel this result in Jackson's case. *Skinner*

---

[2] IC3, also known as the "Internet Crime Complaint Center," is a government website used to report cybercrime. It is run by the FBI.

*v. State*, No. 2022-KA-00622-COA, 2023 WL 5922082 (Miss. Ct. App. Sept. 12, 2023). In that case, Skinner's counsel moved for a mental evaluation informing the trial court that he had "serious concerns about the defendant's mental condition and his ability to stand trial . . . ." *Id.* at *2 (¶9). Denying the motion, the trial court explained that although "there are some issues," Skinner "does have some logical thought" and "appear[s] to . . . be intelligent under the circumstances." *Id.* at *11-12 (¶¶57, 60). We held based on the trial judge's "interactions and observations . . . it was not necessary to send Skinner for a mental evaluation." *Id.* at *16 (¶79).

¶31. But there is a key difference between that case and the one today: counsel for defense requested a mental examination, and the trial court considered the issue. It is true that, here, neither Jackson nor his attorney requested a mental examination at any time during the proceedings. But the failure to make a timely request for such a determination does not diminish the protection of Jackson's fundamental right not to stand trial while incompetent. *See Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *Pate v. Robinson*, 383 U.S. 375, 384 (1966).

¶32. A mental examination of Jackson should have been ordered. And while I acknowledge the trial court most certainly is in the best position to make that call, under this record—complete with imagined assassinations of a terrorist leader—it was an abuse of discretion not to order a mental competency examination.

¶33. Perhaps Kenneth Jackson is competent to stand trial; perhaps he is not. Due Process requires that we simply check.

13

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION IN PART.**